Nichols, C. J.
There is no question involved here of the constitutionality of the act, the defect, alleged being that the enrolled bill as filed in the office of the secretary of state, though duly signed by the president of the senate and the speaker of the house in the manner and form required by the constitution, and approved by the governor, is not in words and figures the identical bill passed by both houses of the general assembly.
It appears that the enrolled bill differs in one respect only from the bill shown by an examination of the journals of both houses to have been passed. The difference is to be found in subdivision (a) 3 of Section 486-8, the enrolled bill reading: “The members of all boards and commissions and heads of principal departments, boards and commission appointed by the governor, or by and with his consent;” while the journals of the two bodies show that this paragraph should have read: “The members of all boards and commissions and heads of principal departments, and bureaus appointed by the governor or by and with his consent.” For some unexplained reason the word “bureaus,” which had been substituted for the words “boards and commission” by the action of both houses, was not inserted in the enrolled copy of the bill, and as both the president of the senate and speaker of the house, as well as the governor, signed the enrolled bill, the actual law as it appears in Volume 106, page 404, *249 Ohio Laws, varies from the bill as actually passed both houses, as appears from their respective journals as above set forth.
This court having disposed of this case on other grounds, will give but little consideration to the question as to whether the admitted variance between the enrolled bill and the bill as actually passed is of that substantial nature requiring'the holding that the law as signed by the presiding officers and the executive and filed with the secretary of state was null and void. Were it necessary to consider this phase of the case at length it may be said that this court would be loath indeed to invalidate a law covering twenty pages of a volume of the session laws for the reason that a discrepancy existed as to one word of one clause of one sentence of one paragraph of one division of one section of a long and involved bill; for it appears that if the one word “bureaus” had been substituted by the enrolling - clerk for the words “boards and commission” there would have been no variance.
This is especially true since the failure to make the substitution in noway affected the integrity, object or scope of the bill.
The utmost that could be claimed for the substitution is that it would take out from the operation of the civil service law the heads of a few of the state bureaus, whereas it is not at all illogical to contend that the language of the paragraph of the section in question contained in the bill as signed by the governor does exempt the so-called heads of “bureaus.”
*250 The provisions of the constitution pertinent to this inquiry are found in Article II. Section 9 thereof declares that each house shall keep a correct journal of its proceedings. At the desire of any two members, the yeas and nays shall be entered upon the journal; and, on the passage of every bill, in either house, the vote shall be taken by yeas and nays, and 'entered upon the journal; and no law shall be passed in either house without the concurrence of a majority of all the members elected thereto.
Section 17 thereof is as follows: “The presiding officer of each house shall sign, publicly in the presence of the house over which he presides, while the same is in session, and capable of transacting busi-. ness, all bills and joint resolutions passed by the general assembly.”
Section 16 provides:
“Every bill shall be fully and distinctly read on three different days, unless in case of urgency three-fourths of the house in which it shall be pending, shall dispense with the rule. No bill shall contain more than one subject, which shall be clearly expressed in its title, and no law shall be revived, or amended unless the new act contains'the entire act revived, or the section or sections amended, and the section or sections so amended shall be repealed. Every bill passed by the general assembly shall, before it becomes a law, be presented to the governor for his approval. If he approves, he shall sign it and thereupon it shall become a law and be filed with the secretary of state. If he does not approve it, he shall return it with his objections in writing, *251 to the house in which it originated, which shall enter the objections at large upon its journal, and may-then reconsider the vote on its passage. If three-fifths of the members elected to that house vote to repass the bill, it shall be sent, with the objections of the governor, to the other house, which may also reconsider the vote on its passage. If three-fifths of the members elected to that house vote to repass it, it shall become a law notwithstanding the objections of the governor, except that in no case shall a bill be repassed by a smaller vote than is required by the constitution on its original passage. In all such cases the vote of each house shall be determined by yeas and nays and the names of the members voting for and against' the bill shall be entered upon the journal. If a bill shall not be returned by the governor within ten days, Sundays excepted, after being presented to him, it shall become a law in like manner as if he had signed it, unless the general assembly by adjournment prevents its return; in which case, it shall become a law unless, within ten days after such adjournment, it shall be filed by him, with his objections in writing, in the office of the secretary of state. The governor may disapprove any item or items in any bill making an appropriation of money and the item or items, so disapproved, shall be void, unless repassed in the manner herein prescribed for the repassage of a bill.”
Just a cursory examination of these constitutional provisions will indicate that some are directory merely, others plainly mandatory.
*252 Failure to follow these mandatory provisions must invalidate acts so passed, and there being no other available tribunal, resort must be had to the courts of the state to determine the validity thereof.
The provisions clearly mandatory are those to the effect that no law shall be passed without the concurrence of a majority of all the members elected to each house of the general assembly; that the presiding officer of each house shall sign all bills, publicly in the presence of the house over which he presides, while the same is in session and capable of transacting business; that each house shall keep a journal and that on the passage of a bill the vote shall be taken by yeas and nays and entered thereon ; and that every bill, before it becomes a law, shall be presented to the governor for his approval.
The important question in the instant case is whether the court will look beyond the enrolled bill to ascertain, first, if it has been enacted in strict accord to constitutional requirements; second, if the contents or subject-matter of the bill, as duly authenticated and signed by the proper officers, may be disputed by the journals of either or both branches of the general assembly.
There is a wide range of disagreement among the courts on both of these questions. There is a concurrence of the authorities to the effect that a bill when signed as required by the constitution by the presiding officers of both houses of the general assembly, approved by the governor and deposited in the archives of the state, is prima facie evidence at least of the validity of its enactment. Some authorities are to the effect that the power to de *253 termine whether these requirements have been complied with is necessarily vested in the legislature itself, and when the authentication and promulgation of the legislative department has been had in conformity to the constitution, then this prima facie evidence ripens into a conclusive presumption of validity and the courts are without power to inquire into the matter. In other words, the bill-so authenticated and promulgated imports absolute verity. This; indeed, is the attitude of the supreme court of the United States with reference to acts of congress, as announced in the case of Field v. Clark, 143 U. S., 649.
Still other authorities hold that it is within the jurisdiction of the courts to go behind the enrolled bill and consult the journals of the general assembly, not only to ascertain whether the bill in question received a constitutional majority of the enacting body, but also to determine whether the bill so constitutionally authenticated is in like words with the bill as shown by the journals, and indeed to examine and consider other evidence on the subject, with the important qualification, however, that before a bill otherwise validly enacted will be held a nullity there must be a material difference between the enrolled bill and the bill as passed by the two houses. In this line of authorities the holding is that the whole act falls whenever a material variance is discovered between the bill as passed and the bill as authenticated and approved.
The present-day authorities are pretty evenly divided on the question. Fifty years ago,- or even thirty years back, there was a predominance of au *254 thority to the effect that the journals of the enacting body prevailed, over the authentication and approval, and where a material discrepancy existed the enrolled, authenticated and approved bill must give way to the bill as shown by the journals; but after the decision of the supreme court of the United States in Field v. Clark, supra, the current of authority commenced to run decidedly in the other direction.
Omitting Ohio for the moment, the present line-up would seem to be about as follows:
Enrolled bill controlling — the United States, California, Connecticut, Indiana, Iowa, Louisiana,. Maine, Mississippi, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Montana, Georgia, Kentucky, Utah, Oklahoma, South Carolina, Texas, North Dakota and South Dakota.
Journals controlling — Alabama, Arkansas, Colorado, Florida, Illinois, Kansas, Maryland, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, Oregon, Tennessee, Virginia, Washington, West Virginia, Wisconsin and Wyoming.
In the list of states given as holding that the enrolled bill controls over the journals, the authorities do not all go to the limit of the holding of the supreme court of the United States, that the enrolled bill is absolutely unimpeachable, but they do go so far as to hold that the contents or subject-matter of the enrolled bill cannot be impeached by anything appearing on the journals.
There has been no citation of cases from Arizona, Delaware, Idaho, New Mexico, Massachusetts, Rhode Island and Vermont.
*255 The leading case on the subject is that of Field v. Clark, supra. In that case it was held that it was not competent to show from the journals of the United States senate and the house of representatives, from the reports of committees, or from other documents printed by authority of congress, that enrolled bill designated H. R. 9416, as finally passed, contained a section that did not appear in the enrolled act in the custody of the state department, the first proposition of the syllabus of that case reading: “The signing by the speaker of the house of representatives and by the president of the senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed congress; and when the bill thus attested receives the approval of the president, and is deposited in the department of state according to law, its authentication as a bill that has passed congress is complete and unimpeachable.”
It will be thus noted that the supreme court of the United States attaches to a bill thus authenticated absolute verity and puts it beyond the pale of dispute or attack from any source whatever.
Eminent counsel representing the plaintiff in-error, while admitting that the authority outside our own state is hopelessly divided, contend with earnestness that Ohio, by virtue of its prior decisions, is entitled to rank with the journal-controlled states. They have cited five decisions of the supreme court of Ohio, commencing with the case of The State, ex rel., v. Moffitt, 5 Ohio, 358, continuing with Miller v. The State, 3 Ohio St., 475; Fordyce v. Godman, Auditor, 20 Ohio St., 1; The *256 State, ex rel. Herron, v. Smith, 44 Ohio St., 348; and Beyer et al. v. Burress, 67 Ohio St., 500.
An examination of these several cases justifies the contention at once that Ohio is not to be classed with the supreme court of the United States, nor with the several states that have gone so far as to hold that the authentication of a bill in constitutional form renders a bill immune from any and all attacks, but it does not justify the assertion that Ohio is to be ranked with those other states that have held that the journals of the two houses of the general assembly control .in all respects, nor that the contents of a bill so duly authenticated can be brought into question by the mere disclosure from the journals of some difference in language even of a substantial nature.
The oldest case, decided in 1832, Hitchcock, J., writing the opinion, was that of The State, ex rel., v. Moffitt, supra. Here Lemuel Moffitt was assuming to discharge the duties of an- associate judge of the county of Ashtabula, claiming to have been elected as such by the general assembly in 1831. It appeared from an examination of the journals of •the house and senate that one of them showed the election of Lemuel Moffitt to this position and the other showed the election of Samuel Moffitt. The error was not corrected, and there was therefore no concurrence of action by the two bodies. Neither one of the presiding officers signed the certificate of election to the governor and no commission was issued by the governor. Lemuel Moffitt was therefore acting without commission, and there was not involved in the case any question as. to the supreme *257 authority as between the act of the general assembly on the one hand and the authentication by its presiding officers and the approval by the governor on the other hand.
The court held that under the then existing statute it was the duty of the governor to have issued a commission upon the production of a certificate, and that without it the governor did not possess the power to act. This particular case cannot, therefore, be urged as authority to the effect that the journals control as against the due authentication and approval of an act of the general assembly. The court held, and rightly held, that the journals of the general assembly could appropriately be inspected, since the occupant of the position rested his title wholly on an alleged election by the general assembly, without any commission or other authentication, and he himself relied on the journals as a warrant for his exercising the functions of his office. Under such circumstances an inspection of the legislative journals was not only justified but necessary. Here there was no other source to prove or disprove the claim of the respondent, nor was there any conflict whatever between the general assembly on the one hand and its presiding officers and the governor on the other. The only conflict was between the journal of the house and that of the senate.
In the case of Miller v. The State, supra, the question arose over the fact that the journal of the senate did not affirmatively show that the bill under consideration was read on three different days or *258 even read three different times, although such readings were not dispensed with by a three-fourths vote as required by the constitution. Thurman, J., in the opinion, says, at page 482:
“A statute may, upon its face, be repugnant to the constitution, and therefore void, no matter how regular may have been the steps by which it was enacted. And although the power was at one time very seriously denied, yet it is no longer to b¿ doubted that the courts are bound to treat such a statute as a mere nullity.
“But the case is quite different where no such repugnancy appears in the act itself, and its validity is assailed upon the ground that it was not passed in the mode prescribed by the constitution. By the term ‘mode/ I do not mean to include the authority in which the lawmaking power resides, or the number of votes a bill must receive to become a law. That the power to make laws is vested in the assembly alone, and that no act has any force that was not passed by the number of votes required by the constitution, are nearly, or quite, self-evident propositions. These essentials relate to the authority by which, rather than to the mode in which, laws are to be made.”
Following the suggestion in the opinion of the eminent jurist just quoted, the court incorporated in the fourth paragraph of the syllabus the following language: “No bill can become a law without receiving the number of votes required by the constitution, and if it were found, by an inspection of the legislative journals, that what purports to be a law upon the statute book was not passed by the *259 requisite number of votes, it might possibly be the duty of the courts to treat it as a nullity.”
It will readily be seen, therefore, that this case cannot be urged as authority for the proposition that courts will inspect legislative journals to ascertain if there be minor or even substantial discrepancy between an enrolled act duly authenticated and the act as it would appear from an inspection of the journals only.
The case of Fordyce v. Godman, Auditor, supra, presents the question in but little different aspect from that of Miller v. The State, supra. Here the court held, in effect, that the courts would inspect the journals of the general assembly to ascertain if certain claims purporting to have been allowed by the general assembly received the concurrent votes of two-thirds of the members elected to each branch of the general assembly. There is certainly nothing in the syllabus of that case, nor for that matter in the opinion of Scott, J., that warrants the claim that the courts are authorized to inspect these same journals to ascertain if there be difference between the enrolled bill duly authenticated and approved and the bill as it might be made to appear from the journals.
The case of The State, ex rel. Herron, v. Smith, supra, falls far short of the mark of aligning Ohio with the states that rest everything on the journals of the lawmaking body. The question involved arose out of a claim that a certain bill had not received a constitutional majority of the members elected to the senate, it being urged that four of the votes required to' furnish this constitutional ma *260 jority were not cast by de'jure members of that body.
The court refused to entertain the claim that it could or would inspect the legislative journals for the indirect purpose of trying the title to de facto members of the state senate.
The court did hold in the first proposition of the syllabus that where the journal of each house of the general assembly shows that a law received the concurrence of the number of members required by the constitution for its adoption and that it was publicly signed in the presence of each house by its presiding officer, as required by Section 17, Article II of the Constitution, its authenticity cannot be impeached by parol evidence that one or more of the members in either house recorded as concurring in its adoption had, prior thereto, been seated, upon the determination of a contested election, by less than a constitutional majority, although the concurrence of such member or members was necessary to the number of votes required by the constitution for the passage of the law.
The last of the Ohio authorities is the case of Beyer et al. v. Burress, supra.
In that case, as may be ascertained from the record, the court inspected the legislative journals, which disclosed the fact that after a bill had passed both branches of the general assembly a motion to reconsider was carried in the house of representatives and that the bill remained on the calendar unacted on until adjournment sine die was had.
Finding such to be the fact the court held that the bill, although enrolled, signed by the presiding of *261 ficers of the two branches of the general assembly, delivered to the secretary of state and published in Volume 95, Ohio Laws, page 557, was nevertheless not a valid enactment.
This holding was manifestly proper, since the parliamentary effect of a reconsideration of the passage of a bill is to effectually undo everything that had been done before.
Here, however, as in the other Ohio cases, there was no issue of fact raised as to the contents of a duly enrolled bill and the bill as it might appear from a judicial inspection of the legislative journals. It is only in line with the Ohio doctrine that the courts will consult as appropriate evidence the legislative journals whenever an issue of fact is raised as to any certain bill having received a constitutional majority of both branches of the general assembly.
From the doctrine thus established in Ohio the court is not now disposed to depart; indeed, it is quite willing to reiterate it as in all respects proper and in line with public policy. The court, however, ✓ will not extend the matter of the inspection of the legislative journals to the extént asked in the instant case for the purpose of establishing the fact that a discrepancy of a material nature exists between the enrolled bill so duly authenticated and approved and the bill as it might appear to be on such inspection of the journals.
The court is moved to this conclusion from the fact, first, that the discrepancy alleged is not of that substantial and material character that would justify any such enlargement of the doctrine of in *262 spection; second, that the Ohio authorities cited do not warrant or suggest any such enlargement; third, that an extension of the privilege of inspection of the legislative journals would manifestly operate to produce confusion and uncertainty, without any consequent benefit, and would be clearly against public policy.
Consideration of weight must be givyn to the general knowledge of the inevitable tendency of all legislative bodies of these modern days to put off final action on more important measures until the closing days of the session.
At this time differences of long standing are being ironed out by conference committees, and an examination of the volumes of our session laws will disclose the fact that in these last days bills to the number of a hundred or more are finally enacted into law.
The joint enrolling committees of the general assembly and the clerical forces of both bodies are fairly overrun with bills, and must of necessity labor to the point of exhaustion.
The wonder is not that some mistakes creep into our laws, but rather that more serious and blundering errors are not to be found. It is really a tribute to the efficiency of the clerical forces of the general assembly that so much o°f certainty and correctness is had.
If we are to submit every law to the rigid pound-of-flesh exaction of inspection and comparison that is suggested by the plaintiff in error, public security and safety would in a short time require the abolition of the present bicameral system of representa *263 tive government and the substitution of one small body of legislative experts, who, with the exactitude and certainty of scientists, would write, enact and repeal our laws.
Meanwhile an enrolled bill bearing the solemn attestation that it was signed by the presiding officers of each house, while the same was in session and capable of doing business, and which thereafter was presented to and signed by the governor and by him filed with the secretary of state, must, if the legislative journals show it to have received the necessary constitutional majority, be considered to be what it purports to be, and not under any circumstances subject to impeachment as to its contents or the mode of- its passage.

Judgment affirmed.

Johnson, Donahue, Wanamaker, Newman, Jones and Matthias, JJ., concur.